

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————————X

SPA 77 G L.P.,

               Plaintiff,

     -against-

MOTIVA ENTERPRISES LLC,

               Defendant.

——————————————————————————X

MOTIVA ENTERPRISES LLC

               Third-Party Plaintiff,

     -against-

SERGIO ENTERPRISES INC. and
SERGIO CELIKOYAR,

               Third-Party Defendants.

——————————————————————————X

CV-09-1665 (SJF)(WDW)

**OPINION & ORDER**

FEUERSTEIN, J.

     On April 23, 2009, plaintiff Spa 77 G L.P. ("Spa 77") commenced this action against defendant Motiva Enterprises LLC ("Motiva") pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332(a), seeking to recover money allegedly due and owing from defendant to plaintiff for, *inter alia*, unpaid rent and real estate taxes and certain repairs to the subject premises, as well as costs and attorney's fees. On January 12, 2010, Motiva commenced a third-party action against third-party defendants Sergio Enterprises Inc. and Sergio Celikoyar (collectively, "Sergio") seeking defense and indemnification, contribution and damages for unjust enrichment. Spa 77 now moves pursuant to Rule 56 of the Federal Rules of Civil

1

Procedure for summary judgment. For the reasons stated herein, Spa 77's motion is granted in part and denied in part.

I.   Background

A.   Factual Background[1]

1.   The Parties

On June 19, 1989, Spa 77's predecessor, Staller Properties Associates, entered into a lease with Motiva's predecessor, Star Enterprise, for certain premises located in Port Jefferson Station, New York ("the subject premises"), for use principally as a gasoline service station. (Parties' respective 56.1 Statements and Counterstatements [collectively "56.1 Stat."], ¶¶ 1). The term of the lease expired June 30, 2006. (56.1 Stat., ¶¶ 2).

In or about 1991 until on or about June 30, 2006, Sergio executed leases and supply agreements with Texaco, Motiva's predecessor, and Motiva for the use and operation of a Texaco branded retail gasoline station on the subject premises. (Affidavit of Sergio Celikoyar [Sergio Aff.], ¶ 2). On or about June 30, 2006, Sergio vacated the premises after Motiva failed to renew its franchise. (Sergio Aff., ¶ 3).

2.   Termination of Lease

By letter dated June 6, 2006, Shell Oil Products US ("Shell"), on behalf of Motiva, advised Spa 77 that it "consider[ed] the lease to be terminated as of June 30, 2006" and that "[o]n

---

[1] The factual allegations are derived from the parties' Rule 56.1 statements and counterstatements and the affidavits and exhibits submitted in support of, and in opposition to, Spa 77's motion. The facts are not in dispute, unless otherwise indicated.



or before that date [Motiva] will surrender the Premises to [Spa 77], subject * * * to the provisions of the Lease." (Affidavit of Cary F. Staller in Opposition to Motiva's Motion to Vacate its Default [Staller Aff. (Vacate Mot.)], Ex. B). By letter dated June 22, 2006, counsel for Spa 77 responded, *inter alia*, that pursuant to the terms of the lease, Spa 77 "expect[ed] that all underground tanks, piping, and related equipment w[ould] be removed ('Equipment Removal'), and the premises w[ould] be clean at the end of the Lease term or after any permitted clean-up periods" and demanded that Motiva "provide, for [Spa 77's] approval, the name of the environmental engineer that [it] intend[ed] to retain for purpose of conducting the environmental studies required by the Lease." (Staller Aff. (Vacate Mot.), Ex. C).

In July 2006, Motiva, by its consultants, removed underground tanks, piping and related equipment from the leased premises. (56.1 Stat., ¶¶ 9). During the removal activities, petroleum impacted soil was encountered and reported to the New York State Department of Environmental Conservation ("DEC"). (56.1 Stat., ¶¶ 10). The DEC opened "Spill No. 06-04605" to conduct oversight of Motiva's remediation of the contaminated soil. (56.1 Stat., ¶¶ 10, 11).

By letter dated July 21, 2006, Shell, as agent for Motiva, returned Motiva's keys to the building on the subject premises and advised Spa 77 that Motiva had completed the removal of the underground storage tanks on the premises. (Second Affidavit of Cary F. Staller [Staller Aff.], Ex. G). By letter dated August 1, 2006, counsel for Spa 77 advised counsel for Motiva that "neither Shell's tendering of the keys nor [Spa 77's] receipt of the keys operated to terminate Shell's obligations under the Lease;" that Motiva had not complied with the testing and reporting requirements of paragraphs 58, 59 and 63 of the lease; that Motiva had not repaired the asphalt paving or removed the monitoring wells on the subject premises; that "Shell's obligations under

3

the Lease, including its obligation to pay rent, remain[ed] in full force and effect, until all of the conditions [under the Lease] [were] satisfied;" and that Motiva was required to pay its rent for July and August, as well as the real estate taxes for June, July and August, which had not been paid. (Staller Aff., Ex. G).

Kleinfelder East, Inc. ("Kleinfelder") prepared a Tank Excavation Assessment ("TEA") report on behalf of Motiva relating to the underground storage tank removal activities conducted at the subject premises. (Staller Aff., Ex. H). In a letter to the DEC dated September 12, 2006, Kleinfelder reported, *inter alia*, that all but one (1) of the post-excavation soil samples were below DEC Recommended Soil Cleanup Objectives ("RSCOs") for volatile organic compounds ("VOCs") and semivolatile organic compounds ("SVOCs"), but one (1) soil sample revealed a concentration of benzene "slightly above the RSCOs; and that "[a]ll analytical results" of groundwater samples were below DEC groundwater standards. (Id.; see also TEA report annexed to Affidavit of Robert E. Rule [Rule Aff.] as Exhibit A). Kleinfelder, on behalf of Motiva, recommended that the DEC close Spill No. 06-04605. (Staller Aff., Ex. H).

By letter dated September 22, 2006, the DEC advised Shell that "[b]ased upon a review of [its] file, [Shell] ha[d] completed the investigation/remediation for the [subject] site;" that the DEC had "no further requirements for the referenced spill [Spill No. 06-04605] at th[at] time;" and that "[t]he spill file [Spill No. 06-04650] ha[d] been removed from [the DEC's] active spill list." (Rule Aff., Ex. B). The DEC further advised, however, that "[s]hould additional environmental problems be discovered at th[e] site, [the DEC] w[ould] require further action at that time." (Id.).

Motiva paid rent under the lease at the agreed upon rental rate of ten thousand dollars

($10,000.00) per month, plus real estate taxes, for the months of July, August and September 2006, but not thereafter. (56.1 Stat., ¶¶ 21, 22).

By letter dated October 12, 2006, counsel for Spa 77 advised counsel for Motiva that "additional testing and clean-up [was] required at the site before the DEC case [could be] closed and before Motiva's obligation under the Lease [would be] deemed completed." (Staller Aff., Ex. H). Specifically, Spa 77 advised Motiva: (1) that since soil samples had only been taken in the "areas in or around underground storage tanks and related systems," testing and, if necessary, remediation still had to be conducted in "areas around the periphery of the premises and/or in any storm drains, cesspools or like areas;" (2) that remediation was required of "several of the tested areas [that] did contain [VOCs];" and (3) that Motiva did not comply with all of the testing requirements of the lease. (Id.)

After failing to receive a response to their October 12, 2006 letter, counsel for Spa 77 sent counsel for Motiva another letter, dated November 1, 2006, requesting that Motiva meet its obligation under the lease to pay rent for the months of October and November 2006. (Staller Aff., Ex. I). By letter dated November 3, 2006, Motiva advised counsel for Spa 77 that it believed that it had "satisfied is [sic] testing obligations under the Lease and [was] not required to conduct further testing of the Property," and was not responsible for paying rent for the months of October and November 2006 because "there [were] no proscribed environmental conditions on the Property" and "Motiva [was] no longer accessing the Property." (Affidavit of William A. Ruskin [Ruskin Aff.], Ex. A).

By letter dated November 7, 2006, counsel for Spa 77 reiterated to counsel for Motiva that "Motiva has failed to fully perform its Lease termination obligations at the subject

5

Premises." (Staller Aff., Ex. I). According to counsel for Spa 77, "[u]ntil all required Tests [were] performed and an environmental engineer certifie[d] that no environmental conditions exist[ed] at the site, Motiva's obligations under the Lease continue[d]." (Id.) In addition, counsel for Spa 77 advised that "in conjunction with the removal of the [underground storage tanks] and related systems, the asphalt at the premises was damaged and should have been repaired in accordance with paragraph '63' of the Lease," but no repairs had been made. (Id.)

By letter dated January 18, 2007, counsel for Spa 77 demanded that Motiva address the outstanding issues by February 16, 2007. (Staller Aff., Ex. I).

By letter dated February 14, 2007, Shell advised Spa 77's counsel that although Motiva denied that further environmental testing was "necessary or required under the lease[,] * * * in the spirit of compromise, Motiva agree[d] to perform additional tests by taking samples of the five drywells located on the Property and installing one monitoring well/soil boring down-gradient of the cesspool." (Rule Aff., Ex. C)[2].

By letter dated February 15, 2007, in-house counsel for Shell advised Spa 77 that Motiva and Shell's consultant, Sovereign Consulting Inc. ("Sovereign"), were "willing to perform the additional supplemental testing at the [subject] property * * *" and proposed the scope of work they would perform. (Staller Aff., Ex. J). By letter dated that same date, Motiva requested permission from Spa 77 to enter the subject premises and perform work "to determine if hydrocarbons originating from the Shell service station [were] present and remediate such hydrocarbons as may be required by applicable law." (Staller Aff., Ex. K). Motiva further advised that the work performed on its behalf by Sovereign might "result in minor disruptions of

---

[2] Portions of the February 14, 2007 letter were marked "Redacted - Confidential Settlement Negotiations."

6

the normal use of [Spa 77's] property" and indicated that it would restore the property "to its approximate former condition as soon as possible after [Motiva] ha[d] ascertained if hydrocarbons from the former Shell service station [were] present and, to the extent required, such hydrocarbons ha[d] been remediated." (Id.)

On March 21, 2007, Spa 77 consented to Motiva's entry upon the subject premises for the purposes of performing the additional testing and any remediation and "agree[d] to the minor disruption of the normal use of [its] premises as described" ("the access agreement"). (Id.) The access agreement specifically provided that "to the extent anything in [Motiva's] [February 15, 2007] letter or [Spa 77's] consent conflict[ed] with the obligations of Motiva * * * pursuant to [the] Lease * * *, the provisions of the Lease shall prevail." (Id.)

By letter dated June 26, 2007, Sovereign reported to the Suffolk County Department of Health ("SCDOH") its results from the environmental due diligence investigation ("EDDI") it conducted at the site on behalf of Motiva on May 8 and May 15, 2007. (Staller Aff., Ex. L; see also Rule Aff., Ex. D). Specifically, Sovereign reported that "[a]ll VOC and SVOC compounds were below detection limits in the groundwater sample," but that "[t]wo (2) metals, Chromium and Nickel were detected slightly above the New York State Groundwater Standards * * *."[3] (Id.) By letter dated October 2, 2007, the SCDOH advised Sovereign that based upon the information contained in its EDDI report, the SCDOH "require[d] that stormwater drainage systems DW-1 through DW-5 and the sanitary wastewater disposal system [at the subject

---

[3] VOCs were detected in samples of the bottom sediment of all drywells on the premises except for DW-1, although all compounds except for 1,2,4-Trimethylbenzene for DW-5 and "a few compounds for the sanitary pool" were below SCDOH cleanup objectives; SVOCs were detected in all drywells and the sanitary pool with compounds exceeding SCDOH cleanup objectives in all drywells; and total heavy metals exceeded SCDOH cleanup objectives in all drywells and the sanitary pool. (See Staller Aff., Ex. N).

premises] be remediated due to the detection of elevated levels of [VOCs], [SVOCs] and heavy metals." (Staller Aff., Ex. M; Rule Aff., Ex. E).

By letter dated March 4, 2008, Sovereign reported to the SCDOH the remediation activities it had completed at the subject premises on behalf of Motiva on December 5, 11 and 13, 2007. (Staller Aff., Ex. N). Sovereign reported its endpoint soil sample results as: "[a]ll soil concentrations of metals, [VOCs], and [SVOCs] detected [were] below the SCDOH Action/Cleanup Objectives with the exception of arsenic * * * for drywell (DW-2). However, in addition to the endpoint sampling, TCLP metals were analyzed for disposal purposes and it [was] demonstrated that TCLP (arsenic) [was] non-detect for drywell (DW-2)." (Id.) Sovereign recommended "no further action related to remediation of the subject drywells/sanitary pool at [the subject] location." (Id.)

By letter dated May 12, 2008, the SCDOH advised Sovereign that "[b]ased on the field observations of [the SCDOH] and the data contained within [Sovereign's reports dated March 4, 2008 and May 2, 2008], [the SCDOH] ha[d] concluded that Suffolk County cleanup objectives ha[d] been achieved. No further work [was] required by [the SCDOH] with regard to leaching pools DW-1, DW-2, DW-3, DW-4, DW-5 and the on-site sanitary leaching pool." (Rule Aff., Ex. F).

By letter dated July 28, 2008, Sovereign advised the DEC that Motiva had abandoned an onsite monitoring well and that all of the monitoring wells installed on the subject premises had been "properly abandoned according to regulations" on July 2, 2008. (Staller Aff., Ex. P).

3.     Use of the Premises after Termination of the Lease

Spa 77 claims that it was unable to use or lease the subject premises, in whole or part, during the entire time that an environmental condition existed on the premises and was being remediated on behalf of Motiva. (Spa 77 56.1 Stat., ¶¶ 25, 26). Motiva and Sergio dispute this contention. (Motiva and Sergio's 56.1 Stat. ¶¶ 25, 26).

On May 16, 2008, Spa 77 leased the subject premises to Hess Corporation ("Hess") ("the Hess Lease").[4] (Staller Aff., Ex. D). Paragraph 7 of the Hess Lease provides, in relevant part:

> "Physical Suitability. After the execution of this Lease, [Hess] will have the right for ninety (90) days ("Inspection Period"), without interference and without payment of any rent or other charge, to enter upon the Premises for the purposes of doing preliminary engineering work, conducting field surveys, well drilling, soil and ground water sampling, percolation and other tests, and doing other matters as may be necessary or advisable to enable [Hess] reasonably to determine whether the Premises are physically suitable for use as the Station, and that there have been no spills or leaks of petroleum products or other environmental contamination at the Premises. * * * If [Hess], in its sole discretion, determines that the Premises are not physically suitable for use as the Station or that there have been spills or leaks of petroleum products or other environmental contamination at the Premises, [Hess] will promptly so notify [Spa 77] within the Inspection Period, and this Lease will terminate at [Hess's] option, without any further liability under this Lease other than such liability that shall have accrued prior to the termination of this Lease. * * *."

(Staller Aff., Ex. D).

By letter dated August 8, 2008, Hess advised Spa 77 that it had "conducted an environmental review of the Premises and found SVOC's and metals in the soil and VOC's, in the groundwater all above the applicable NYSDEC soil standards. * * * The exceedances [sic] represent a reportable condition of which the NYSDEC must be notified by the property owner."

---

[4] Motiva's contention that the Hess Lease should not be considered because it constitutes extrinsic evidence of the parties' intention is disingenuous. The Hess Lease is not attached as evidence relevant to the interpretation of the lease provisions between Spa 77 and Motiva, but as evidence of Spa 77's inability to use the premises during Motiva's remediation activities and/or as a result of a hazardous condition existing on the premises.

(Staller Aff., Ex. E). Accordingly, Hess terminated the Hess Lease pursuant to paragraph 7, but indicated that it might "be interested in reinstating the Lease if [Spa 77] [was] agreeable to amend the Lease to reflect the current condition of the Premises, and a mechanism for [Spa 77] to pay all costs associated with environmental remediation." (Id.)

On October 6, 2008, Spa 77 and Hess entered into an amended lease ("the Hess Amendment"), pursuant to which, *inter alia*, Hess rescinded its termination of the Hess Lease and which specifically noted that "[t]he contamination set forth in the [Pre-Acquisition Site Investigation report dated July 21, 2008 by EnviroTrac Ltd. (the "EnviroTrac Report")] [was] deemed environmental contamination existing on the Premises prior to the Commencement Date [of the Hess Lease] and arising from the ownership or operation of the Premises prior to the Commencement Date and shall establish a baseline and any subsequently discovered contamination of the same substances shall be presumed to be Pre-Commencement Date contamination, unless levels exceed those set forth in the EnviroTrac Report by more than one order of magnitude." (Staller Aff., Ex. F).


4.     Sub-Tenancy of Premises

On or about July 13, 2001, Sergio entered into a lease agreement with Sunrise Outdoor Advertising Company ("Sunrise"), pursuant to which Sunrise installed two (2) billboard advertisements, each approximately thirty-five feet (35') wide and fifteen feet (15') tall, on the northwest edge of the subject premises. (Sergio Aff., ¶¶ 4, 5, Exhibit A). Pursuant to the lease agreement between Sergio and Sunrise ("the Sunrise Lease"), Sunrise was required to pay to Sergio an annual payment of two thousand four hundred dollars ($2,400.00) for a term of five (5)

years, "to continue for successive like terms unless cancelled * * * by either party in writing * * *." (Sergio Aff., Ex. A).

According to Sergio, representatives of Texaco and Motiva regularly visited the subject premises several times per month in the normal course of business but never complained of, or objected to, the presence of Sunrise's billboards on the subject premises. (Sergio Aff., ¶ 6).

On August 19, 2008, counsel for Spa 77 served Sunrise with a "Notice to Terminate Tenancy by Sufferance." (Ruskin Aff., Ex. B).

On December 15, 2008, judgment of possession was entered in the holdover proceeding commenced by Spa 77 against Sunrise in the Sixth District Court of Suffolk County ("Suffolk District Court"), pursuant to which delivery of the subject premises was awarded to Spa 77 and a warrant of eviction was issued to remove Sunrise from the subject premises. (Staller Aff. (Vacate Mot.), Ex. G). The Suffolk District Court also awarded Spa 77 damages against Sunrise in the amount of four hundred dollars ($400.00) for Sunrise's use and occupancy of the premises for October and November 2008. (Ruskin Aff., Ex. C).

Spa 77 claims that before July 2008, and through February 2009, it was unable to use the portion of the subject premises being physically occupied by Sunrise and that Sunrise's occupation of that portion of the subject premises interfered with, and further delayed, Spa 77's ability to re-let the subject premises. (Spa 77 56.1 Stat., ¶ 34). Motiva and Sergio dispute this contention. (Motiva and Sergio's 56.1 Stat., ¶¶ 34).

B. Procedural History

On April 23, 2009, Spa 77 commenced this action against Motiva pursuant to this Court's

11

diversity jurisdiction under 28 U.S.C. § 1332(a), seeking to recover money allegedly due and owing under the lease for, *inter alia*, unpaid rent and real estate taxes and certain repairs to the subject premises, as well as costs and attorney's fees. On January 12, 2010, Motiva commenced a third-party action against Sergio seeking defense and indemnification, contribution and damages for unjust enrichment.

Spa 77 now moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment.

II.      Discussion

A.      Standard of Review

Summary judgment should not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); see Ricci v. DeStefano, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (Emphasis added) (internal quotations and citation omitted)). "A fact is material if it 'might affect the outcome of the suit under governing law.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci, 129 S.Ct. at 2677 (quoting Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

If the district court determines that there is a genuine dispute as to a material fact, the court must then "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant," Pucino v. Verizon Wireless Communications, Inc., 618 F.3d 112, 117 (2d Cir. 2010) (quoting Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008)), to determine whether there is a genuine issue for trial. See Ricci, 129 S.Ct. at 2677. A genuine issue exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer, 524 F.3d at 163 (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," F.D.I.C. v. Great American Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quotations and citation omitted), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id.; see also Spinelli, 579 F.3d at 166. Thus, the nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. Spinelli, 579 F.3d at 166 (internal quotations and citations omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

13

B.    Contract Interpretation[5]

"[T]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quotations and citation omitted). "The language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement," Id. at 138-9 (quotations and citation omitted), "and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Chapman v. New York State Division for Youth, 546 F.3d 230, 236 (2d Cir. 2008). "Conversely, a contract is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Krumme, 238 F.3d at 139 (alterations, internal quotations and citations omitted). "The question of whether a provision in an agreement is ambiguous is a question of law." Chapman, 546 F.3d at 236. "Under New York law, the presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." Id. (citing Kass v. Kass, 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174, 180 (N.Y. 1998)).

In interpreting contracts under New York law, "'the intent of the parties governs.'" Katel Ltd. Liability Co. v. AT & T Corp., 607 F.3d 60, 64 (2d Cir. 2010) (quoting Crane Co. v. Coltec Industries, Inc., 171 F.3d 733, 737 (2d Cir. 1999) (internal quotations and citation omitted)); see also Chapman, 546 F.3d at 236. Courts ascertain the parties' intent "'from the plain meaning of

---

[5] New York law governs Spa 77's claims since the parties rely upon New York law in their brief and "such implied consent . . . is sufficient to establish choice of law." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quotations and citation omitted).

the language employed in the agreements, rather than from extrinsic evidence,'" <u>Katel</u>, 607 F.3d at 64 (quoting <u>Crane</u>, 171 F.3d at 737 (internal quotations and citation omitted)); <u>see also</u> <u>Krumme</u>, 238 F.3d at 139 ("when interpreting an unambiguous contract, words and phrases are given their plain meaning" (alterations, quotations and citations omitted)), and must "'give full meaning and effect to all of [the contract's] provisions.'" <u>Katel</u>, 607 F.3d at 64 (quoting <u>American Express Bank Ltd. v. Uniroyal, Inc.</u>, 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1st Dept. 1990); <u>see also</u> <u>Chapman</u>, 546 F.3d at 236. "'Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law and the case is ripe for summary judgment.'" <u>Katel</u>, 607 F.3d at 64 (quoting <u>American Express</u>, 562 N.Y.S.2d at 614); <u>see also</u> <u>Crane</u>, 171 F.3d at 737 ("If the parties' intent is unambiguously conveyed by the plain meaning of the agreements, then interpretation is a matter of law, and [the plaintiff's] claims may be resolved by summary judgment * * *." (internal quotations and citations omitted)).

1.      Articles 58 and 63 of the Lease

Article 58 of the lease between Spa 77 and Motiva, as assignees, provides, in relevant part:

> "The parties agree that the operation of a gasoline service station for the sale of fuel from petroleum products and/or chemicals or substances or liquids, in connection therewith and the dispensing and the storage of such products has been the subject of rules and regulations by governmental agencies regarding safety and the environmental impact of such use. Notwithstanding any other provision contained herein to the contrary, [Motiva] agrees that it shall save [Spa 77] harmless from such claims, penalties, or awards of judgments on account of all causes whatsoever, and that this representation shall continue to bind [Motiva] and its successors in interest without releasing [Motiva] from any primary injury hereunder. In furtherance of this obligation, [Motiva] shall provide to [Spa 77] a certified test, in writing, performed by an environmental engineer selected and/or previously approved by [Spa 77], who shall conduct soil tests to ground water,

water tests, air, wind current tests and such other tests that may hereafter be technologically developed which would be likely to detect any condition which may expose [Spa 77] for claims of liability for violation of any statutory or common law environmental standards. Such tests shall be performed at the following times and/or events:

\* \* \*

(b) Upon the expiration of the period of closing, abandonment, desertion, or discontinuance of use as a retail gasoline service station as described in paragraph '35(vi)' hereinbefore.

(c) Immediately upon the end of the term hereof, or any extended term, and/or upon the termination of this lease on account of any of the conditions set forth herein.

(d) In the event [Motiva] shall exercise its option to extend the term of this lease as provided in paragraph '70' hereinafter, then as a condition of the extension of this lease, [Motiva] shall supply to [Spa 77] a test as required herein within ninety (90) days from the extension of such term.

(e) Upon the termination of the extension of this lease, or at termination of this lease on account of any condition contained herein."

(Staller Aff., Ex. C).

Article 63 of the lease provides:

"At the termination of this lease, notwithstanding any of the provisions contained herein to the contrary, [Motiva] shall remove all underground tanks, piping and related equipment and fill such holes in a proper and workman-like manner and such work shall be performed in compliance with all the then current ordinances governing such procedures. The discharge of [Motiva] for the obligations of this lease shall include, in addition to all other provisions contained herein, that [Motiva] shall supply to [Spa77], the report of an engineering firm selected and/or previously approved by [Spa 77], certifying, in writing, as to the absence of any condition of pollution which would constitute violations of any environmental standard or standards then in effect at such date. However, prior to the performance of such work, [Motiva] shall have soil tests performed and reports made as provided in paragraph '58' hereof, and if required, conduct and pay for cleaning up costs as provided in paragraph '59' hereinabove. This provision and the conditions contained herein are intended to survive the termination of this lease."

(Staller Aff., Ex. C). In sum, Articles 58 and 63 require, *inter alia*, that, upon termination of the

lease, Motiva: (1) provide to Spa 77 a written certification by an environmental engineer that he or she conducted certain tests on the premises likely to detect any condition which may expose Spa 77 for claims of liability for violation of any statutory or common law environmental standards; (2) remove all underground tanks, piping and related equipment; (3) fill all holes created by its removal of the underground tanks, piping and related equipment in a proper and workman-like manner; (4) provide to Spa77 a written report of an engineering firm certifying to the absence of any condition of pollution on the subject premises which would constitute a violation of any environmental standard; and (5) if required, conduct and pay for cleaning up costs.[6]

### a. Article 58 and Reporting Requirement in Article 63

The lease unambiguously requires Motiva, upon termination of the lease, to, *inter alia*, provide to Spa 77 a written certification by an environmental engineer who conducted "soil tests to ground water, water tests, air, wind current tests and such other tests that may hereafter be technologically developed which would be likely to detect any condition which *may expose* [Spa 77] for claims of liability for violation of any statutory or common law environmental standards." (Staller Aff., Ex. C, ¶ 58) (emphasis added). Motiva's strained reading of Article 58, i.e., that its duties under that provision are only triggered in the event Spa 77 "has been exposed to a claim of liability," (Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment [Motiva Opp.], p. 8), is contrary to the emphasized language and further renders superfluous the requirements in that provision of when such testing "shall be performed." Since the plain

---

[6] Spa 77 does not claim that Motiva breached its obligations to remove all underground storage tanks, piping and related equipment or to conduct and pay for clean up costs. It is only the other three (3) obligations under Articles 58 and 63 at issue.

meaning of the language used in Article 58 does not support Motiva's interpretation of it, and is amenable to only one reasonable interpretation, no ambiguity is presented raising a triable issue of fact. Motiva did not discharge its obligations under the lease by conducting the limited soil and groundwater testing of certain areas of the premises during the underground storage tank removals and subsequent remediation in 2006.

Nor does the DEC's closure of Spill No. 06-04605 relating to the underground storage tank removals evidence Motiva's discharge of its obligations under Article 58. Indeed, in its letter dated September 22, 2006, the DEC specifically indicated that "[s]hould additional environmental problems be discovered at th[e] site, [it] w[ould] require further action at that time," (Rule Aff., Ex. B), thus evidencing the limited nature of the testing and remediation activities conducted on the subject premises at that time. Furthermore, the comprehensiveness of the testing required by Article 58, allowing for technological advances, does not render that provision ambiguous, as suggested by Motiva.

Similarly, Motiva's interpretation of the lease, and its repeated references to the "claims or penalties" language contained in Article 58, entirely ignores Article 63 of the lease. Indeed, Article 63 of the lease broadly states that Motiva's obligations under the lease "shall include, in addition to all other provisions contained herein, that [Motiva] shall supply to [Spa77], the report of an engineering firm selected and/or previously approved by [Spa 77], certifying, in writing, as to the absence of any condition of pollution which would constitute violations of any environmental standard or standards then in effect at such date." Article 63 does not provide that Motiva's obligations would be based upon the pendency or imminency of a claim or penalty based upon any violation of an environmental standard. Based upon the plain meaning of the

language in that provision, and affording meaning and effect to both Articles 58 and 63 of the lease, upon termination of the lease Motiva was required to cause an environmental engineer to conduct not only soil tests to ground water relating to the underground storage tank removals, but any test likely to expose an environmental condition or pollutant on the premises which would constitute a violation of any environmental standard, and to certify in writing as to the absence of any such environmental condition or pollutant.

Moreover, there is no language in either Article 58 or Article 63 from which it can be inferred, as suggested by Motiva, that its obligations thereunder were dependent upon whether or not it caused or was responsible for the environmental condition or pollutant on the subject premises.

The fact that Sovereign discovered an environmental condition during more comprehensive testing of the subject premises in May 2007, and which the SCDOH required to be remediated, is further evidence of Motiva's failure to comply with its obligations under Articles 58 and 63 of the lease. Pursuant to the plain language of Article 63, Motiva only fulfilled its obligation under the lease when it provided Spa 77 with written certification "as to the absence of any condition of pollution which would constitute violations of any environmental standard or standards then in effect at such date." Although Sovereign reported its remediation activities and recommended that no further action be taken at the subject premises to the SCDOH and certain individuals at Shell on March 4, 2008, there is no indication that Sovereign's report was ever provided to Spa 77 or its counsel. (Staller Aff., Ex. N). Only Sovereign's July 28, 2008 report to the DEC indicates that it was provided to, *inter alia*, counsel for Spa 77. (Staller Aff., Ex. P). Accordingly, Motiva did not fulfill its obligations under Articles 58 and 63 of the

lease until July 28, 2008, when it provided a copy of Sovereign's report to Spa 77.

b.    Re-Paving Requirement of Article 63

Motiva does not dispute that the lease required it to remove all underground storage tanks, piping and related equipment from the leased premises at the termination of the lease, (56.1 Stat., ¶¶ 8), and Spa 77 does not claim that Motiva breached that obligation. Rather, Spa 77 claims that Motiva breached its duty under Article 63 of the lease to fill the holes created by its removal activities "in a proper and workman-like manner."

To establish a claim for breach of contract under New York law, the plaintiff must demonstrate: (1) the existence of an agreement; (2) that the plaintiff has adequately performed his or her obligations under the agreement; (3) that the defendant failed to perform his or her obligations thereunder; and (4) damages resulting to the plaintiff from the defendant's nonperformance. See Diesel Props S.r.l. v. Greystone Business Credit II LLC, ___ F.3d ___, 2011 WL 37813, at * 8 (2d Cir. Jan. 6, 2011); Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004). Although Motiva did not fill the holes purportedly created by its underground storage tank removal activities, i.e., by re-paving the asphalt, thereby breaching its obligation under the plain meaning of Article 63 of the lease, Spa 77 has not established any damages resulting from Motiva's nonperformance.[7] Accordingly, the branch of Spa 77's motion seeking summary judgment on its breach of contract claim (first cause of action) relating to Motiva's failure to repair the blacktop paving is denied.

---

[7] Spa 77 claims damages in excess of twenty-nine thousand eight hundred fifty dollars ($29,850.00) as a result of this breach based upon a two (2) year old repair estimate. (56.1 Stat., ¶ 23). However, there is no evidence that Spa 77 ever repaired, or incurred any expenses for the repair of, the blacktop paving.

20

2.    Article 59 of the Lease

Article 59 of the lease provides:

> "In the event a proscribed environmental condition exists at the termination of the Lease; [Motiva] shall take all necessary corrective actions to eliminate the proscribed condition at the demised premises and also reimburse [Spa 77] for all costs, fines, damages and charges which [Spa 77] may incur as a result of such condition. In the event such a condition occurs and endures for a period beyond the term of the Lease, then [Motiva] shall have access to the Demised Premises for a period of up to six months beyond the term of this Lease for the purpose of taking all corrective actions to eliminate the proscribed condition. During this six month period, [Motiva] shall pay monthly rent equal to the total rent payment paid under the Lease for the last month of the Lease. In the event [Motiva] has not completed all necessary corrective action to eliminate the proscribed condition during this six month period, then, after such six month period, [Motiva] shall pay to [Spa 77] the reasonable market rent for the use of the Demised Premises for the time period during which [Spa 77] is unable to use the Demised Premises, or a portion thereof, on account of (i) [Motiva's] corrective actions and/or (ii) the hazardous environmental condition."

(Staller Aff., Ex. C).

Motiva's contention that no "proscribed environmental condition" existed on the premises ignores Sovereign's June 26, 2007 report that certain SVOCs and heavy metals exceeded SCDOH cleanup objectives and the SCDOH's October 2, 2007 letter requiring remediation of the five (5) drywells and sanitary wastewater disposal system on the subject premises. Motiva seeks to limit its obligations to compliance with DEC standards, when the plain language of the relevant provisions encompasses rules and regulations of all "governmental agencies," thereby including the SCDOH, and "any environmental standard or standards," not just the DEC's. (Staller Aff., Ex. C, ¶¶ 58, 63). Moreover, Motiva's interpretation is contrary to its contention that "the findings of the DEC *and SCDOH*, * * * are critical to interpretation of the Lease. The meaning of * * * testing that 'would be likely to detect any condition which may expose the landlord for claims of liability for violation of any statutory or common law

environmental standards' (Article 58) are inextricably intertwined with the State *and County's* standards and regulations." (Motiva Opp., p. 13) (emphasis added).

Based upon the plain meaning of the language in Article 59, Motiva was required to pay the monthly rent it had paid Spa 77 for the last month of the lease during the time period within which it needed to take corrective action to eliminate any proscribed environmental condition for the first six (6) months after termination of the lease, i.e., July 2006 through, and including, December 2006; and the reasonable market rent thereafter in the event Spa 77 was "unable to use the Demised Premises, or a portion thereon, on account of (i) [Motiva's] corrective actions and/or (ii) the hazardous environmental condition."[8] Spa 77's entitlement to rent for the first six (6) months after termination of the lease is not dependent upon Spa 77's use of the premises and arose because a "proscribed environmental condition" existed on the premises for which Motiva was obligated to take corrective actions to eliminate.

Moreover, the evidence in the record clearly establishes that Spa 77 was unable to use the subject premises on account of both Motiva's corrective actions and a hazardous environmental condition existing on the premises. Indeed, in August 2008, Hess, a potential lessee of the premises, exercised its right to terminate the Hess Lease as a result of the environmental conditions existing on the premises. Motiva's contention that Spa 77 "does not address whether a hazardous condition existed" on the premises, (Motiva Opp., p. 12), ignores this evidence in the record. Moreover, the reports of Sovereign and the SCDOH are sufficient to establish that

---

[8] Spa 77 demands the same "last-months" rental rate, in the amount of ten thousand dollars ($10,000.00) per month, for the entire period, i.e., from July 2006 through and including July 2008. Motiva does not argue that that amount is not a "reasonable market rent" for use of the subject premises. Accordingly, I accept the ten thousand dollar ($10,000.00) amount as a reasonable market rent applicable to the entire period.

hazardous environmental conditions existed on the premises, i.e., SVOCs and heavy metal levels exceeding SCDOH standards. The unsupported assertions by Motiva's counsel that those environmental conditions were not "hazardous" and are "generally considered background, or runoff, conditions" are insufficient to raise a triable issue of fact.

Accordingly, under the plain language of Article 59 of the lease, Motiva is required to pay Spa 77 an amount equal to the last month's rent under the lease for the entire period from July 2006 through and including July 2008.[9] Motiva's failure to pay the rental rate to Spa 77 during the period from October 2006 through and including July 2008 constitutes a breach of Article 59 of the lease. Therefore, the branch of Spa 77's motion seeking summary judgment on its first cause of action is granted to the extent that Spa 77 is awarded an amount equal to the last month's rent under the lease (ten thousand dollars [$10,000.00]) for each month for the period from October 2006 through and including July 28, 2008 (twenty-two [22] months), in the total amount of two hundred twenty thousand dollars ($220,000.00).[10]

3.     Articles 20 and 21 of the Lease

Article 20 of the lease between Spa 77 and Motiva, as assignees, provides as follows:

> "If, at the expiration or termination of this lease or any extension thereof, [Motiva] shall hold over for any reason, the tenancy of [Motiva] thereafter shall be from month to month only and be subject to all other terms and conditions of this lease, in the absence of a written agreement to the contrary."

---

[9] Motiva has already paid rent for the months of July 2006, August 2006 and September 2006. Thus, it is liable for rental payments to Spa 77 for only twenty-two (22) months.

[10] Since Spa 77 has not, *inter alia*, established the amount of any real estate taxes allegedly required to be paid by Motiva under the lease, the branch of its motion seeking to recover real estate taxes is denied.

(Staller Aff., Ex. C).

Article 21 of the lease provides:

> "[Spa 77] consents that [Motiva] may * * * sublet the premises, or any part
> thereof, provided that [Motiva] shall remain liable to [Spa 77] for the performance
> of all of the terms hereof, * * *."

(Staller Aff., Ex. C).

Spa 77 claims that pursuant to Article 20 of the lease, Motiva is obligated to pay the ten

thousand dollar ($10,000.00) monthly rent for the subject premises for the period during which

Sunrise occupied the subject premises following Motiva's discharge of its obligations under the

lease, i.e., from August 1, 2008 through February 2009.

Under New York law, "upon termination of a lease, it is the obligation of the tenant to

remove the undertenant." Stahl Associates Co. v. Mapes, 111 A.D.2d 626, 629, 490 N.Y.S.2d 12

(1st Dept. 1985); see also Radin v. Arthur Holding Co., Inc., 149 A.D.2d 576, 540 N.Y.S.2d 267,

268 (2d Dept. 1989). "[A] wrongful holding over by a subtenant is to be deemed the same as a

wrongful holding over of the tenant sublessor." Stahl, 111 A.D.2d at 629, 490 N.Y.S.2d 12; see

also Radin, 149 A.D.2d 576, 540 N.Y.S.2d at 268. Thus, a tenant is subject to liability for

holdover damages based upon its failure to discharge its lease obligation to remove its subtenant

upon the termination of the lease. See Chock Full O'Nuts Corp. v. NRP LLC I, 11 A.D.3d 385,

386, 784 N.Y.S.2d 43 (1st Dept. 2004) (holding that the tenants were subject to liability for

holdover damages based upon their failure to discharge their lease obligation to remove their

subtenant at the expiration of the base lease). The tenant's lack of knowledge of the continued

occupancy of the premises by the subtenant does not affect its liability for holdover damages.

See, e.g. Stahl, 111 A.D.2d at 629, 490 N.Y.S.2d 12 (finding that the lease required the tenant to

deliver possession of the premises at the end of the term without the subtenant in possession even though the subtenant holds over without the tenant's authority and against his wishes).

Nonetheless, there is a triable issue of fact regarding whether Motiva is liable to Spa 77 for holdover damages relating to its alleged breach of Article 20 of the lease because, *inter alia*, the parties' lease ("the over-lease") expired pursuant to its terms on June 30, 2006, thereby terminating Motiva's leasehold interest in, and right to use and possession of, the subject premises; Motiva had discharged all of its lease obligations prior to the time period for which Spa 77 seeks holdover damages; Spa 77 commenced a holdover proceeding against Sunrise seeking possession of the subject premises after Motiva had discharged its obligations under the over-lease; and Spa 77 argued, and the Suffolk District Court found, in the holdover proceeding that Sunrise became a tenant by sufferance upon termination of the over-lease.

In Marx v. Kinney System, Inc., 236 A.D.2d 336, 654 N.Y.S.2d 20 (1st Dept. 1997), the New York State Supreme Court, Appellate Division, First Judicial Department ("the First Department") held that the landlords were barred from seeking damages against the tenant based upon the failure to remove the subtenants upon expiration of the lease because, *inter alia*, the landlords had acquiesced in the trial court's determination that the subtenant had become the landlord's tenant at sufferance and had proceeded in the trial court against only the subtenant for use and occupancy.

Similarly, in Stahl, 111 A.D.2d at 629, the landlord accepted the tenant's refusal to renew the lease and reconveyance of its leasehold interest; affirmatively acted to end the landlord-tenant relationship by obtaining permission from the Conciliation and Appeals Board to deny the lease renewal; and moved promptly to enforce its right to possession of the premises by immediately

instituting dispossess proceedings against the subtenant. Id. In finding a triable issue of fact with respect to whether the tenant was liable to the landlord for use and occupancy of the premises during its subtenant's holdover, the First Department noted that that case did "not involve the simple proposition of a tenant's liability for the holding over of a subtenant." Id. Similarly, Spa 77 accepted Motiva's reconveyance of its leasehold interest, at least as of July 2008 when Motiva indisputably discharged its obligations under the lease[11], and promptly instituted proceedings on its own behalf to dispossess Sunrise from the subject premises once Motiva fully discharged its obligations under the lease. Accordingly, there is a triable issue of fact with respect to whether Motiva is liable to Spa 77 for Sunrise's use and occupancy of the subject premises after July 2008, when it fully discharged its obligations under the over-lease that had terminated in June 2006. Therefore, the branch of Spa 77's motion seeking summary judgment on its second cause of action is denied.[12]

C.    Attorney's Fees and Costs

Article 37 of the lease provides:

> "In case suit shall be brought for recovery of possession of the leased premises, for the recovery of rent or any other amount due under the provisions of this lease, or because of the breach of any other covenants herein contained on the part of [Motiva] to be kept or performed, and a breach shall be established, [Motiva] shall pay to [Spa 77] all expenses incurred therefor, including a reasonable attorney's

---

[11] Spa 77 only seeks to recover damages based upon Sunrise's holdover for the period after Motiva discharged its obligations under the lease, i.e., from August 2008 through and including February 2009.

[12] Spa 77's arguments regarding Motiva's purported obligations under additional Articles of the lease, which are raised for the first time in its reply memorandum of law, will not be considered. Spa 77 clearly could have raised those arguments in its original memorandum of law.

fee which shall be in the minimum amount of $750.00."

(Staller Aff., Ex. C).

"Under the general rule in New York, attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute or court rule." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003). "Under New York law, 'the court should not infer a party's intention' to provide counsel fees as damages for a breach of contract 'unless the intention to do so is unmistakably clear' from the language of the contract." Id. (quoting Hooper Associates, Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 492, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989)); see also E*Trade Financial Corp. v. Deutsche Bank AG, 374 Fed. Appx. 119, 123 (2d Cir. Mar. 30, 2010).

The parties' intention to indemnify attorney's fees is unmistakably clear from the language of Article 37 of the lease. Since Spa 77 commenced this action to recover money due under the lease, and has also established Motiva's breach of Article 59 of the lease, Spa 77 is entitled to recover attorney's fees and legal expenses under Article 37 of the lease. Accordingly, the branch of Spa 77's motion seeking summary judgment on its claim to recover legal expenses and attorney's fees (third cause of action) is granted to the extent that Spa 77 may recover attorney's fees and legal expenses with respect to its claims to recover money due and owing and/or for breach of contract relating to Articles 58, 59 and 63 of the lease, and that branch of its motion is otherwise denied without prejudice to renewal in the event Spa 77 is ultimately successful on its remaining claims.

Spa 77 shall serve an affidavit or declaration setting forth the amount of attorney's fees

27

and legal expenses recoverable as set forth herein, accompanied by contemporaneous timesheets, invoices and/or any other evidence in support of the amount claimed, **within ten (10) days of entry of final judgment, or other final resolution, of this matter**, or it will be deemed to have waived its claim to recover attorney's fees and legal expenses.

III.    Conclusion

For the reasons stated herein, the branches of Spa 77's motion seeking summary judgment on its first and third causes of action are granted to the extent that Spa 77 is awarded two hundred twenty thousand dollars ($220,000.00), plus attorney's fees and legal expenses as set forth herein, and Spa 77's motion is otherwise denied. The parties are directed to appear with authority or with persons with authority to settle this matter in my courtroom located at 1010 Federal Plaza, Central Islip, New York, 11722, on **March 7, 2011 at 12:30 p.m.** for a pretrial conference.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: February 22, 2011
       Central Islip, N.Y.